ANGLO AMERICAN INSURANCE GROUP, P.L.C. and Anglo American Insurance Holdings Limited, Plaintiffs,

v.

CALFED INC., XCF Acceptance Corporation, as successor by merger to CalFed Inc., and William J. Fitzpatrick, Defendants.

William J. FITZPATRICK,
Third–Party Plaintiff,

v.

ANGLO AMERICAN INSURANCE COMPANY LIMITED, Third–Party Defendant.

CALFED INC. and XCF Acceptance Corporation, as successor by merger to CalFed, Inc., Third–Party Plaintiffs,

v.

KPMG PEAT MARWICK McLINTOCK,
Third–Party Defendant.

No. 92 Civ. 9137 (RLC).

United States District Court,
S.D. New York.

Feb. 26, 1996.

Stroock & Stroock & Lavan, New York City (Alvin K. Hellerstein, Brian M. Cogan, Alan Z. Yudkowsky, Karen Leo, of counsel), for Second Third–Party Plaintiffs.

Dechert Price & Rhoads, New York City (James E. Tolan, William K. Dodds, Judith

L. Bachman, of counsel), for Second Third–Party Defendant.

Morgan, Lewis & Bockius, New York City (Laurie E. Foster, James M. Conway, of counsel), for Plaintiffs.

## *OPINION*

ROBERT L. CARTER, District Judge.

Defendant and third-party plaintiff XCF Acceptance Corp., as successor by merger to CalFed, Inc. ("CalFed"), brought this amended second third-party complaint [1] against KPMG, an English accounting partnership, for breach of contract, negligence, and indemnification and contribution. CalFed now moves for transfer to the United States District Court for the Central District of California, pursuant to 28 U.S.C. § 1404(a).

### Background [2]

CalFed alleges that in the mid–1980s, CalFed, a federally chartered savings and loan association headquartered in Los Angeles, California, decided to invest in an insurance company in the London market. CalFed consulted with its California accountants and auditors Peat Marwick Main & Co. ("PMM"). In consultation with PMM and its English affiliate, third-party defendant KPMG, CalFed developed an association with Weavers, an experienced London underwriter. KPMG was the auditor for Weavers and for other companies underwritten by Weavers ("the Stamp companies" or "the Stamp"). KPMG suggested, and CalFed agreed, that KPMG would be the auditors and accountants for Anglo American Insurance Company Limited ("Anglo"), the free-standing insurance company that CalFed would form as a subsidiary. CalFed entered

---

1. Plaintiffs in the main action are the Anglo American Insurance Group and the Anglo American Insurance Holdings Ltd. Formerly known as Mazard P.L.C. and Magister Agency Investments Ltd., respectively, plaintiffs purchased CalFed's subsidiary, Anglo American Insurance Company Limited ("Anglo"), and then changed their corporate names. In the main action, plaintiffs brought suit against CalFed and William J. Fitzpatrick. Fitzpatrick, a former officer and director of Anglo, subsequently brought the first third-party action against Anglo for indemnification to the extent he is found liable on plaintiffs' negligent misrepresentation claims.

2. Most of the facts in this case are in dispute. The background facts as recited are based upon the allegations put forth by CalFed, the third-party plaintiff. In considering the § 1404(a) motion before the court, the court has resolved all factual disputes in CalFed's favor. *See* Section II–A, *infra*, the court's discussion of personal jurisdiction; *Pacific Atlantic Trading Co., Inc. v. The M/V Main Express*, 758 F.2d 1325, 1327 (9th Cir.1985).

into an agency agreement with Weavers to administer and oversee the freestanding insurance company subject only to oversight by KPMG. CalFed claims it engaged KPMG to perform complete and independent audits of the proposed company, to render business advice concerning the London insurance market, to report to CalFed, PMM, and Anglo any market problems that affect CalFed's investment, and to advise CalFed on potential investments in related companies.

CalFed sold Anglo to plaintiffs in February, 1990. The main action arose when plaintiffs sued CalFed in December, 1992[3] for breach of warranty and negligent misrepresentation regarding warranties in the sales agreement between CalFed and plaintiffs.[4]

CalFed argues that it reaffirmed the representations and warranties in the agreement in reliance on the advice and counsel of KPMG; that KPMG assisted and advised CalFed (a) on representations and warranties required by CalFed as seller,[5] and (b) in negotiating certain provisions of the sales agreement; that KPMG reviewed the proposed sales agreement; that after the agreement was executed, upon request by CalFed and pursuant to its engagement, that KPMG cooperated with plaintiffs and plaintiffs' accountants in performing due diligence; that KPMG advised CalFed on Anglo's financial statement, Anglo's reserves for UK tax liability and the recognition of profits, and the impact of foreign tax credits on CalFed; and

that KPMG refused CalFed's requests and demands to assist CalFed in defending itself against plaintiffs' claims.

CalFed therefore brought claims in an amended second third-party action[6] for breach of contract, negligence, and indemnification or contribution against KPMG for breaching its:

> obligation to act in good faith, to reasonably cooperate with CalFed in respect of its auditing and accounting work and, as necessary and appropriate, to explain, support and defend KPMG's work concerning the matters undertaken in the engagement, particularly given the absence of any financial or operating staff of the subsidiary, and the complete control by Weavers of the combined affairs and assets of [its] entire [client base] including CalFed's subsidiary. (Am.2d Third–Party Compl. ¶ 10).

## Threshold Questions

### I. *Plaintiff as Movant*

CalFed moves for transfer under 28 U.S.C. § 1404(a), which provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

▮ The movant carries the burden of establishing that transfer should be granted.[7]

---

**3.** Because the sales agreement included a New York choice of law and choice of forum clause, the main action was brought in New York. CalFed points to this clause as the reason that CalFed brought its second third-party action against KPMG in New York. (Order To Show Cause, ¶ 6).

**4.** Specifically, plaintiffs alleged breach by CalFed for, *inter alia,* (1) the failure of Anglo's audited and unaudited financial statements to comply with English accounting standards; (2) the failure to disclose certain adverse financial information concerning Weavers; and, (3) the misrepresentations that Anglo had no undisclosed liabilities and no material adverse change in its business or financial condition and that all representations and warranties were true.

**5.** These representations and warranties concerned (1) preparation of Anglo's 1987 and 1988 audited financial statements, (2) 1989 unaudited interim financial statements, (3) CalFed's and

Anglo's knowledge regarding Anglo's financial condition and potential liabilities, and (4) the performance and business affairs of Weavers under its agency agreement with Anglo.

**6.** After CalFed filed its original third-party action against KPMG on July 1, 1994, KPMG moved on October 17, 1994, for dismissal for lack of personal jurisdiction, *forum non conveniens* and failure to state a claim. On November 4, 1994, the court stayed this third-party action pending court-ordered mediation between the plaintiffs and CalFed. CalFed's amended complaint, filed on December 12, 1995, subsequently mooted portions of KPMG's motion to dismiss.

**7.** Even if each party's prospective inconvenience was equal, the movant's motion would have to be denied because the movant bears the burden to establish that there should be a change of forum. *Dow Jones & Co., Inc. v. Board of Trade,* 539 F.Supp. 190, 192 (S.D.N.Y.1982) (Carter, J.).

Here, the motion to transfer has been made by the plaintiff, CalFed. While this is unusual, the plaintiff is not precluded from seeking transfer even though it had the original choice of forum. *Fairfax Dental (Ireland) Ltd. v. S.J. Filhol Ltd.,* 645 F.Supp. 89, 90–91 (E.D.N.Y.1986), *aff'd on other grounds,* 11 F.3d 1074, 1993 WL 470670 (Fed.Cir.N.Y. 1993). Consequently, the usual presumptions as to plaintiff's choice of forum are not appropriate here. *Harry Rich Corp. v. Curtiss–Wright Corp.,* 308 F.Supp. 1114, 1119 (S.D.N.Y.1969) (Lasker, J.) (citing *Ford Motor Co. v. Ryan,* 182 F.2d 329 (2d Cir.1950)).

The threshold question when deciding a § 1404(a) motion by a plaintiff is whether plaintiff has shown that a change in circumstance since the complaint was filed warrants a transfer. This is a sensible rule since the plaintiff initially has the choice of forum. *Fairfax Dental,* 645 F.Supp. at 92 (citing *Harry Rich Corp.* 308 F.Supp. at 1118 (when plaintiff is movant under § 1404(a), he must show a change in circumstance since filing the suit)); *Gipromer v. SS Tempo,* 487 F.Supp. 631, 632 (S.D.N.Y.1980) (MacMahon, J.).

Courts have previously considered a change in circumstance to be evidenced by a state court ruling making a defendant amenable to suit in the transferee state, *Harry Rich Corp.,* 308 F.Supp. at 1118, and the pendency of a related action filed by plaintiff in the transferee district, *Fairfax Dental,* 645 F.Supp. at 92. Courts have not transferred upon motion by the plaintiff when the forum is no longer acceptable to plaintiff due to plaintiff's lack of diligence. *See Spar, Inc. v. Information Resources Inc.,* 956 F.Supp. 392, 394–95 (2d Cir.1992) (finding that plaintiff had ample time to bring the action within the limitations period and that plaintiff sought to avoid a statute of limitations defect through a transfer of venue); *Harem–Christensen Corp. v. M.S. Frigo Harmony,* 477 F.Supp. 694, 698 (S.D.N.Y.1979) (Knapp, J.) (denying transfer where the plaintiffs showed no change in circumstance; rather, the plaintiffs, late in the proceedings, realized that they had mistakenly brought the action in wrong forum).

■ Neither party has addressed this threshold question. However, the court believes a change of circumstances sufficient to satisfy this requirement might be found in the successful completion of the court-ordered mediation process and the resulting settlement agreement between CalFed and plaintiffs.[8] The court ordered the parties to undergo mediation on November 4, 1994, after CalFed filed the second third-party complaint.

Although CalFed does not address the change in circumstance requirement directly, it rests its argument for transfer primarily upon the settlement agreement.[9] CalFed argues that because the parties resolved the main action, a laudable feat, the court must preserve the parties' efforts and intent by transferring the second third-party action and that such transfer is in the interest of justice. Otherwise, both parties to the agreement may opt to nullify it and thereby cause the commencement of two major litigation actions (the main action and the third-party action). Alternatively, the two parties may decide to accept the settlement agreement and CalFed could then voluntarily dis-

---

8. CalFed's other reasons for transfer—convenience of the non-party witnesses and resolution of the alleged personal jurisdiction deficiency over KPMG in this New York action—existed when it filed the complaint. (Memo of Law in Support of CalFed's Mot. to Transfer, at 12).

9. The settlement agreement, *inter alia,* provides that: "(i) CalFed agrees [to] pay to Plaintiffs $7,400,000 (the "Settlement Payment") ... (ii) the Settlement Agreement, and the payment of the Settlement Payment thereunder, is expressly conditioned upon the entry of an Order by this Court transferring the Second Third–Party Action to the United States District Court for the Central District of California (the "Transfer Or-

der") ... (iii) if the Transfer Order is not promptly entered by the Court, either Plaintiffs or CalFed may declare, within 30 days of the filing of the motion to transfer, the Settlement Agreement to be null and void ... (iv) Plaintiffs agree to dismiss with prejudice all of its claims against CalFed and Fitzpatrick ... (v) Fitzpatrick agrees to dismiss with prejudice his claim against Anglo ... and, (vi) the parties to the Main Action and the First Third–Party Action agree to execute and exchange mutual releases." Although thirty days have expired since CalFed filed the motion to transfer, neither the plaintiffs nor CalFed have exercised the option to declare the settlement agreement void.

miss its third-party action against KPMG and refile in California. If that happens, CalFed fears that the potential applicability of California's statute of limitations may bar its claims because the third-party action has been pending in this district since July, 1994.

The court recognizes that the settlement agreement is a self-imposed constraint on CalFed and not one binding on the court. Where CalFed chooses to fence itself in, it cannot cast the court as the gatekeeper faced with two choices: transfer or doom. Moreover, CalFed is not completely barred by California's statute of limitations if faced with filing anew in California. The indemnification claim would survive; a claim for indemnification or contribution does not accrue until CalFed pays the settlement amount to plaintiff.[10] CalFed would be barred from asserting its negligence claim,[11] however, and possibly the breach of contract claim.[12] Lastly, CalFed's characterization of a potential limitations bar, perhaps solely affecting the negligence claim, is not absolute. CalFed may litigate here in New York [13] or in England.

**10.** These causes of action arise from communication between CalFed and KPMG between August, 1993, and January, 1994. The parties agree that on August 25, 1993, and August 27, 1993, counsel for CalFed and KPMG met in London to discuss CalFed's request that KPMG assist CalFed in its defense against the plaintiffs. Over the next several months, CalFed and KPMG exchanged correspondence regarding a possible arrangement until finally both parties refused to accede to the other's conditions. (Reply Decl. of Alvin K. Hellerstein at 1–3; Aff. of R.P.N. Brown in Opp'n to CalFed's Mot. to Transfer at 2–3).

**11.** Cal.Civ.Pro.Code §§ 339, 364 (West 1996) (two year statute of limitations for professional negligence).

**12.** In papers submitted to the court, CalFed cites a four-year limitations period as the applicable bar to its breach of contract claim if it were to refile in California. This period would be applicable to CalFed's claim if, upon refiling, CalFed were to allege facts showing a written contract existed between the parties. *See* Cal.Civ.Pro. Code § 337 (West 1996). Thus, CalFed would not necessarily be barred on its breach of contract claim if it refiled in California because CalFed would have until August, 1997, at the earliest, or until January, 1998, (four years from August, 1993 and January, 1994 respectively) to

The court also may grant a § 1404(a) motion by a plaintiff if the court believes that it would be in the interests of justice to do so, even if CalFed can show no change in circumstance. CalFed directs the court to *Gipromer v. SS Tempo*, 487 F.Supp. 631 (S.D.N.Y.1980) (MacMahon, J.), where the court decided that the transfer requested by the plaintiff was appropriate although the plaintiff could show no change in circumstances after the filing of the complaint. In that case, the court relied on *Corke v. Sameiet M.S. Song of Norway*, 572 F.2d 77 (2d Cir.1978), where the Second Circuit reversed a dismissal based on lack of personal jurisdiction and ordered transfer where plaintiff had chosen the wrong forum. The Second Circuit court did not cite any change of circumstance but instead balanced relative hardships—including a clear limitations bar if plaintiff were to file a new action—entailed in granting or denying transfer. After balancing the hardships to the parties before it, the *Gipromer* court transferred the case because it would serve the interest of justice since a dismissal would subject the plaintiff to a statute of limitations bar in Maine.

file its action. As currently alleged to this court, however, CalFed's breach of contract claim concerns an oral contract and would be barred by a two-year limitations period, Cal.Civ.Pro.Code § 339 (West 1996), which begins to run when the oral contract is repudiated. *Parker v. Walker*, 5 Cal.App.4th 1173, 6 Cal.Rptr.2d 908, 916 (Ct. App.1992).

**13.** CalFed claims that an action in New York may be barred by a lack of personal jurisdiction over KPMG if the parties accept the settlement agreement. The court declines to engage in CalFed's strategic decision-making; the court only addresses CalFed's claim that without a transfer, a grave injustice will result. Potential limitations bars in New York, however, do not seem to be reason for concern: (1) breach of contract has a six-year limitations period which commences when the contract is breached, *T & N PLC v. Fred S. James & Co. of New York, Inc.*, 29 F.3d 57, 59 (2d Cir.1994); (2) negligence has a three-year limitations period which commences when the injury first occurs, *Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 26 (2d Cir.1994); and, (3) indemnity claims have a six-year limitations period which accrues on the date payment is made by the party seeking indemnity. *Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 346, 350 (2d Cir. 1986).

KPMG is incorrect that *Spar, Inc. v. Information Resources, Inc.*, 956 F.2d 392 (2d Cir.1992) requires a different result. Firstly, the Circuit panel declined to accept the Fourth Circuit's analysis, not the *Corke* court's analysis, that "in *all cases* in which there is a procedural bar to suit in the transferor district, but not in the transferee district, the action should be transferred." *Id.* at 394. Secondly, while the Circuit court denied the transfer request by plaintiffs who failed to timely pursue their claim and failed to research the applicable statute of limitations, the court reaffirmed that the guiding principle behind the decision to transfer is whether the decision is "in the interests of justice." *Id.* at 395.

In addition, KPMG refutes CalFed's reliance on *Gipromer* and *Corke* and points out that transfer was premised on § 1406 rather than § 1404(a). However, "a district court need not elect between [§ 1404(a) and § 1406(a)]; it 'has power to transfer the case even if there is no personal jurisdiction over the defendants, and whether or not venue is proper in [the] district, if a transfer would be in the interest of justice.'" *Fresca v. Arnold*, 595 F.Supp. 1104, 1105 (E.D.N.Y.1984).

KPMG also argues that CalFed decidedly chose this forum at least twice in the past—to file the complaint and the amended complaint. CalFed decidedly chose to bring an action against KPMG to recoup any damages paid out to the plaintiffs when CalFed filed its complaint in New York nearly one year after the alleged breach by KPMG. In other words, KPMG argues, the settlement agreement has not raised anew the issue of a procedural bar because CalFed knew that California would be its best place to file the suit since it knew where the convenience of witnesses lay and knew that personal jurisdiction over KPMG in New York was not a certainty because KPMG was not a party to the sales agreement. The question becomes whether the court should overlook the fact that the plaintiff chose this forum and that

now, because of the parties' litigation strategies, the interest of justice necessitates transfer.

In this case, the court finds that the settlement negotiations and the agreement are a sufficient change in circumstance to warrant the court's consideration of a § 1404(a) motion by third-party plaintiff CalFed.[14] The court is pleased with the mostly successful efforts of the parties to resolve their dispute through negotiation rather through litigation even more protracted than it currently appears. Furthermore, the interests of justice—the court's role in ordering mediation—lend support to consideration of the transfer motion. Thus, if CalFed satisfies the remaining requirements for transfer, the court will grant this motion—in the interests of justice.

## II. Could the Action Have Been Brought In Transferee District

To transfer under § 1404(a), the movant must show that the action at bar could have been brought in the proposed transferee district. CalFed must show that venue is proper in the Central District of California and that the district has personal jurisdiction over KPMG on the date of the commencement of this claim. *Wils v. Schulman*, 1991 WL 143444, at *1 (S.D.N.Y. July 24, 1991) (Carter, J.); *Gipromer*, 487 F.Supp. at 633.

### A. Jurisdiction [15]

In determining whether CalFed can show that KPMG is subject to jurisdiction in California, the court follows California law. CalFed moves to transfer the action to California prior to discovery on the issue of jurisdiction. As a result, CalFed need make only a prima facie showing of jurisdiction. *Pacific Atlantic Trading Co., Inc. v. The M/V Main Express*, 758 F.2d 1325, 1326–27 (9th Cir.1985) (when "there is no basis upon which a district judge can resolve disputed issues in affidavits unless the facts are inher-

---

14. While the court rebuffs CalFed's attempt to hamstring the court's decision-making process, the court acknowledges that it ordered the parties to undergo mediation.

15. For the purposes of evaluating CalFed's transfer motion, the court cannot ascertain venue pursuant to 28 U.S.C. § 1391(c), the venue statute governing corporate defendants, until the question of personal jurisdiction over KPMG is resolved.

ently incredible, the plaintiff need only establish a *prima facie* case to support a finding of personal jurisdiction"); *Data Disc, Inc. v. Systems Technology Assocs.,* 557 F.2d 1280, 1285 (9th Cir.1977). The court will construe the facts in the light most favorable to CalFed and resolve all doubts in its favor. *Pacific Atlantic,* 758 F.2d at 1327.

For a California district court sitting in diversity, jurisdiction must comport with the constitutional requirement of due process and with California's long-arm statute, Cal. Code Civ.P. § 410.10. *Core–Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1484 (9th Cir.1993) ("California's long-arm statute allows courts to exercise personal jurisdiction over defendants to the extent permitted by the Due Process Clause of the United States Constitution"); *Vibration Isolation Prods., Inc. v. American National Rubber Co.,* 23 Cal.App.3d 480, 100 Cal.Rptr. 269, 271 (Ct. App.1972). We need only determine whether personal jurisdiction would meet the requirements of due process because the state and federal limits to jurisdiction are coextensive. *Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 269 (9th Cir.1995); *Core–Vent Corp.,* 11 F.3d at 1484.

■ The due process clause prohibits the exercise of jurisdiction over nonresident defendants unless those defendants have "minimum contacts" with the forum state so that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citations omitted). Where the nonresident defendant has not had "continuous and systematic" or "substantial" contacts with the state sufficient to subject it to general jurisdiction, the court may exercise specific or limited jurisdiction if the specific cause of action arises out of a defendant's more limited contacts with the state. *Richard Roth v. Gabriel Garcia Marquez,* 942 F.2d 617, 620 (9th Cir.1991) (citing *Data Disc,* 557 F.2d at 1287).

■ Here, CalFed alleges that California has limited jurisdiction over KPMG. Therefore, CalFed must satisfy the following three-part test to show that KPMG has sufficient "minimum contacts" with the forum: (1) the nonresident defendant purposefully directed his activities or consummated some transaction with the forum or residents thereof, or performed some act by which he purposefully availed himself of the privilege of conducting activities in the forum, thereby invoking the protection of its law; (2) the claim arises out of or is related to the defendant's forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, i.e., it is reasonable. *Id.* at 620–21; *Lake v. Lake,* 817 F.2d 1416, 1420–21 (9th Cir.1987).

*1. Purposeful Availment*

■ The first prong of the test, purposeful availment, requires that the defendant engage in some act purposefully to avail himself of the benefits and protection of the forum state to ensure that a person is not haled into court as the result of random, fortuitous, or attenuated contacts or on account of the unilateral activities of third parties. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (citations and internal quotations omitted). Thus the court's inquiry is whether the defendant's contacts with the forum are attributable to his actions or are solely the actions of the plaintiff; the defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business with the forum state. *Roth,* 942 F.2d at 621; *Rambo v. American Southern Ins. Co.,* 839 F.2d 1415, 1419 (10th Cir.1988) (citing *Burger King,* 471 U.S. at 474–75, 105 S.Ct. at 2183, "[j]urisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State").

■ In examining a defendant's purposeful availment, California distinguishes contract from tort actions. *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir. 1995); *Core–Vent Corp.,* 11 F.3d at 1486. In contract actions, a party may not solely rely upon a contract between the nonresident de-

fendant and a party in the forum state to demonstrate sufficient minimum contacts for jurisdiction; the court must also evaluate "prior negotiations ... contemplated future consequences ... the terms of the contract and the parties' actual course of dealing." *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185; *Ziegler*, 64 F.3d at 473. In tort cases, however, jurisdiction may attach if an out-of-state defendant merely engages in conduct aimed at, and having effect in, the situs state. *Calder v. Jones*, 465 U.S. 783, 789–90, 104 S.Ct. 1482, 1486–87, 79 L.Ed.2d 804 (1984); *Ziegler*, 64 F.3d at 473 (citing *Roth*, 942 F.2d at 621) (" 'within the rubric of 'purposeful availment', the Court has allowed the exercise of jurisdiction over a defendant whose only 'contact' with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state.' ").

 CalFed brings this action for breach of contract,[16] negligence, and indemnification or contribution. (Am.2d Third-Party Compl. ¶¶ 22–25, 26–29, 30–31). CalFed will have satisfied the purposeful

availment prong of the test if the court finds that KPMG purposefully availed itself of the privileges and protection of California under alleged contacts that sound either in contract or tort.[17] However, the court does not reach a decision on the contacts sounding in tort because the court finds that the alleged contract contacts constitute purposeful availment.

CalFed argues that the relationship between CalFed and KPMG constitutes purposeful minimum contacts with California sufficient for the exercise of jurisdiction over KPMG. Construing the facts in favor of CalFed, *Pacific Atlantic*, 758 F.2d at 1327, a verbal contract arose between CalFed and KPMG[18] when CalFed engaged KPMG to perform complete and independent audits of its wholly owned, London-based subsidiary, Anglo; to render business advice concerning the London insurance market; to report to CalFed, PMM and Anglo any market problems that might affect CalFed's investment; and, to advise CalFed on potential invest-

**16.** This claim is apparently one for breach of the implied covenant of good faith and fair dealing. Under California law, this covenant is implicit in every contract; it requires that "neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Murphy v. Allstate Ins. Co.*, 17 Cal.3d 937, 132 Cal.Rptr. 424, 426, 553 P.2d 584, 586 (1976) (citation omitted). The covenant does not, however, "alter specific obligations set forth in the contract ... or add duties independent of the contractual relationship." *Shawmut Bank, N.A. v. Kress Assocs.*, 33 F.3d 1477, 1503 (9th Cir. 1994) (citations omitted) (applying California law).

Although there has been some confusion in California courts over when a breach of the covenant of good faith and fair dealing may be considered an action in tort, *see, e.g., Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85, 44 Cal.Rptr.2d 420, 900 P.2d 669 (1995), it seems fairly clear that outside of the insurance context, such a breach will be considered a contract cause of action. *See Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 227, 765 P.2d 373, 389 (1988). Thus, "[b]ecause the covenant is a contract term, ... compensation for its breach has almost always been limited to contract rather than tort remedies." *Id*. Thus, the court will consider this cause of action to be one sounding in contract.

**17.** Ordinarily, when a plaintiff raises separate causes of action, the court must have in person-

am jurisdiction over the defendant with respect to each claim. However, if the court determines that there has been a sufficient showing of personal jurisdiction to reach trial with regard to one claim, but not the other, the court has discretion to assume jurisdiction over the other under principles analogous to the doctrine of pendent jurisdiction. *Data Disc, Inc.*, 557 F.2d at 1289 n. 8. Because CalFed's causes of action derive from a common nucleus of operative facts, the court will assume that jurisdiction is proper over all causes of action if jurisdiction is proper over one of the causes of action.

**18.** This contract was allegedly formed in London, rather than in California, in a meeting between Tom Allen and others from KPMG, and George Rutland and Jerry St. Dennis from CalFed in early 1987. (Rutland Decl. ¶¶ 7–12). This fact is not fatal to CalFed's showing of purposeful availment. *See Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 840 (9th Cir.1986) (finding purposeful availment where contract was not negotiated in forum state but the contract specifically required performance in forum state); *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1480 (9th Cir.1986) (finding that though contract negotiations occurred outside of forum state, jurisdiction was proper because defendant's foreign acts were purposefully directly at a forum resident).

ments in related companies. (Am.2d Third–Party Compl. ¶ 9).[19]

However, as noted above, CalFed must show more than the existence of a contract with a resident of the forum state for California to exercise jurisdiction over nonresident KPMG. *Burger King, supra,* 471 U.S. at 478, 105 S.Ct. at 2185. The court must look to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine if the defendant's contacts are "*substantial*" and not merely "random, fortuitous, or attenuated." *Id.* at 479, 480, 105 S.Ct. at 2185, 2186 (internal quotations omitted).

With regard to contemplated future consequences, i.e., whether continuing contacts with California were envisioned, *FDIC v. British–American Ins. Co., Ltd.,* 828 F.2d 1439, 1443 (9th Cir.1987), the alleged contract clearly contemplated interaction between CalFed and KPMG for an unspecified amount of time. By its terms—rendering business advice to CalFed, reporting market problems that might affect CalFed's investment, and, advising CalFed on potential investments—the contract indicated continuing contacts with CalFed in California.[20]

Furthermore, CalFed alleges that both parties agreed to the contract with an understanding that KPMG's role was important for CalFed's year-end consolidated financial statements and CalFed's overall financial health—two facets of CalFed's operations that necessarily imply future contact with CalFed and California.[21] The parties' actual course of dealing, as alleged by CalFed, illustrates this alleged understanding: one meeting in California between Tom Allen, a partner of KPMG, and CalFed's senior management, including the chief financial officer, the president, and the chairman of the

**19.** *See also* Am.2d Third–Party Compl. ¶ 8 ("KPMG also represented to CalFed that it would independently audit CalFed's subsidiary, ... and that it would advise CalFed of any significant adverse developments within Weavers or the Stamp that might impact upon CalFed's investment"); CalFed's Proposed Jurisdictional Facts, Exh. A, Decl. of George P. Rutland [former Pres. of CalFed] ["Rutland Decl."] ¶¶ 10–12 ("I told Allen [a partner of KPMG] that KPMG should consider CalFed to be its client even though CalFed was retaining KPMG to audit Anglo.... KPMG was being engaged to look after CalFed's interests ... Allen assured me that he understood and accepted CalFed's terms of retention.").

**20.** *See* CalFed's Proposed Jurisdictional Facts, Exh. B, Memo of 10/12/88 from T.W. Allen [of KPMG] to L.D. Horner [Gen. Manager, PMM] at 2 (summarizing involvement with CalFed) ("I was more exercised by CalFed's apparent lack of background knowledge of the industry and I always took the opportunity to engage George [Rutland] and Jerry [St. Dennis] in discussions on various issues so that there was an awareness of potentially difficult areas"); *Id.* at 2–3 ("George Rutland called me to discuss [CalFed's interest in buying El Paso, another of the Stamp companies] ... [i]t was agreed that [KPMG] would carry out a review [of El Paso] and ... this review did not reveal much that I had not already indicated to George, ... that there was no possible rationale for CalFed to be involved with El Paso."); CalFed's Proposed Jurisdictional Facts, Exh. C, Memo of 04/27/88 from T.W. Allen [of KPMG] to John Williams [of PMM] ("I am meeting with George Rutland [Pres. of CalFed] tomorrow [in London].... I believe it is very important that the people at CalFed have a full understanding of the nature of the business and anything I can do to assist in that process would, I believe, be useful."). While the last cite refers to a meeting in London, the purpose of the meeting was to promote CalFed's financial growth through its subsidiary. As a foreign act purposefully directed towards CalFed and California, this contact and the continuing contacts thus far alleged are consistent with *Burger King*; they do not offend due process because a lack of physical contact with the forum does not preclude a court from exercising jurisdiction. *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184; *see also T.M. Hylwa, M.D. Inc. v. Palka*, 823 F.2d 310, 314 (9th Cir.1987).

**21.** Rutland Decl. ¶¶ 10, 12. *See also* CalFed's Proposed Jurisdictional Facts, Exh. F (at least nine memoranda from November, 1988, to December, 1988, between KPMG and PMM, located in Los Angeles, regarding KPMG's audits of Anglo and the reconciliation of that same information for CalFed's year-end consolidated statements for compliance with U.S. law). KPMG contends that this flurry of memoranda between London and California is incident to its auditing services for Anglo—the only obligation KPMG agreed to accept—and that contact with California arose solely as a result of CalFed's need to incorporate the financial statements of its subsidiaries into to its year-end statements. However, the court must accept CalFed's version of the facts, *Pacific Atlantic*, 758 F.2d at 1327, and finds that KPMG's role in reconciling its audit policies with U.S. accounting principles for CalFed's consolidated statements falls under the ambit of the larger obligation accepted by KPMG in the verbal contract alleged by *CalFed.*

board, on September 20, 1988; two meetings in California between Tom Allen and CalFed's account team at PMM on September 21, 1988 and September 22, 1988;[22] contact through written and telephone communication between CalFed and KPMG; and KPMG's use of PMM in Los Angeles as its agent for the purpose of both initiating the relationship with CalFed and facilitating the performance of KPMG's responsibilities on behalf of CalFed.[23]

KPMG counters that even within the parameters of CalFed's allegations, CalFed initiated all of the contacts with KPMG by going to London to avail itself of London's insurance market, auditors and advisors. The court recognizes that CalFed's alleged contacts, disputed by KPMG, have been found insufficient indicators of purposeful availment when offered without other supporting contacts.[24] Here, however, the verbal contract alleged by CalFed imposed an obligation upon KPMG larger than KPMG asserts. It is this alleged obligation—supported by allegations that KPMG affirmatively offered its opinion and expertise beyond an auditing function related to Anglo—that leads the court to conclude that KPMG would not be haled into California because of "random, fortuitous, or attenuated" contacts. *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183.[25] In satisfying this *Burger King* standard, CalFed has alleged that the third-party defendant has performed affirmative conduct—rendering business advice on potential purchases by CalFed and advice as to how CalFed could better understand the London insurance market—which allows or promotes the transaction of business with California, i.e., CalFed's financial growth. *Roth*, 942 F.2d at 621.

---

**22.** CalFed's Proposed Jurisdictional Facts, Exh. E, Decl. of Jerry St. Dennis ["St. Dennis Decl."] ¶ 5 ("Allen travelled to Los Angeles on September 20, 1988 to meet with John Torrell (Rutland's successor as president of CalFed), me, Robert Dockson (CalFed's chairman), other members of CalFed's senior management and Frank Pekny [PMM audit partner for CalFed in Los Angeles]."); Rutland Decl. ¶ 13 ("CalFed's board wanted Allen to meet with senior management and also with the senior PMM partner (on the CalFed account) in Los Angeles, because CalFed's board wanted PMM and KPMG to collectively represent that they could protect CalFed's interests in Anglo, fulfill CalFed's needs as we had discussed them in London, and to confirm that there were no conflicts of any kind due to KPMG's audit of the [Stamp] companies."); CalFed's Proposed Jurisdictional Facts, Exh. B, Memo of 10/12/88 from T.W. Allen [of KPMG] to L.D. Horner [Gen. Manager, PMM] at 3 (summarizing KPMG's involvement with CalFed) ("during my recent visit to Los Angeles ... [Robert Dockson] was bothered about potential conflicts of interest ... Frank Pekny [of PMM] and I decided ... to allow things to go forward on the basis that, by our actions, CalFed could be satisfied that we were more than conscious of our responsibilities to them.").

**23.** Reply Memo at 9 and CalFed's Proposed Jurisdictional Facts, Exhs. F–H, M–N. *See also* note 27, *infra*, for discussion of the alleged agency relationship.

**24.** *See Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir.1985) ("Both this court and the courts of California have concluded that ordinarily 'use of the mails, telephone, or other international communication simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state.'") (citations omitted), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986); *Sher v. Johnson*, 911 F.2d 1357, 1363 (9th Cir.1990) (declining to follow California law on jurisdiction, an issue of federal constitutional law, and finding that three trips to California, while incident to representation of California citizen by Florida lawyer in a Florida criminal proceeding, arose out of a case centered entirely in Florida and were not in the "parties' actual course of dealing," *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185. CalFed also offers billings received from KPMG—for KPMG's services provided to Coopers & Lybrand in the due diligence activity connected with the sale of Anglo to plaintiffs—to show that KPMG's contractual responsibilities to CalFed included more than auditing Anglo. KPMG disputes this contention factually as well as for the purpose of establishing jurisdiction. *See FDIC*, 828 F.2d at 1443 (citing *Pacific Atlantic*, 758 F.2d at 1329) ("[The Ninth] Circuit has recognized that receipt of payment alone for services rendered outside the forum state is not sufficient to support personal jurisdiction.").

**25.** *See also Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1479–80 and n. 3 (9th Cir.1986) (finding that through nonresident defendant's own actions in agreeing to provide insurance coverage to plaintiff, defendant had created a continuing obligation to plaintiff and a substantial connection with forum state; and that nature of defendant's ongoing commitment to plaintiffs to honor contractual obligations and pay for needed medical care satisfied the rule in *Burger King* that signing a contract, without more, is an insufficient contact for due process purposes).

The court finds that based on the affidavits and submissions to the court, CalFed has made a prima facie showing of purposeful availment. *See also id.* (finding personal jurisdiction even though the plaintiff had initiated contact with nonresident defendants because there was enough purposeful availment based on the future consequences of negotiated contract).

### 2. *Arising Out of Forum–Related Activities*

■ CalFed's claims against KPMG arise out of KPMG's alleged breach of the duty of good faith inherent in the verbal contract with CalFed. Because the contract and the continuing obligation between the parties comprise KPMG's contacts with California, CalFed satisfies this element of the limited jurisdiction test. *Hirsch v. Blue Cross, Blue Shield of Kansas City,* 800 F.2d 1474, 1480–81 (9th Cir.1986).

### 3. *Reasonableness*

■ Finally, the limited jurisdiction test requires that the exercise of jurisdiction be reasonable. Reasonableness is considered as a separate factor in determining the existence of limited personal jurisdiction, rather than, for example, as part of determining whether purposeful availment is reasonable. *Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191, 1198 (9th Cir.1988). Seven factors have emerged as relevant to this inquiry:

(1) The extent of purposeful interjection into the forum state;

(2) The burden on the defendant of defending in the forum;

(3) The extent of conflict with the sovereignty of the defendant's state;

(4) The forum state's interest in adjudicating the dispute;

(5) The most efficient judicial resolution of the controversy;

(6) The importance of the forum to plaintiff's interest in convenient and effective relief; and,

(7) The existence of an alternative forum.

Since none of these factors is dispositive, the court must balance the seven. *FDIC,* 828 F.2d at 1442.

The United States Supreme Court has stated that presence of the reasonableness factors may balance out an otherwise insufficient showing of minimum contacts: "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." Moreover, after a showing that the defendant has purposefully directed his activities at forum residents, the defendant has the burden to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184; *Sinatra,* 854 F.2d at 1198; *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1400 (9th Cir.1986).

■ Because the court has found that KPMG established minimum contacts with California, KPMG must present a compelling case that jurisdiction would be unreasonable.

#### a. Extent of Purposeful Interjection

In light of the court's analysis under the first prong of the limited jurisdiction test, purposeful availment, an analysis of purposeful interjection would be redundant. There is no need to analyze this factor separately as I have concluded that KPMG purposefully availed itself of the privilege of conducting activities in California. *Roth,* 942 F.2d at 623 (citing *Sinatra,* 854 F.2d at 1199 and *Haisten,* 784 F.2d at 1401).

#### b. Burden of Defense

KPMG asserts that "the added costs, burdens[26] and disruptions" to KPMG from the proposed transfer should be "as obvious as this country is wide," and that transfer "impermissibly compounds" the inconvenience associated with mounting a defense in New York. (Memo in Opp'n to Mot. to Transfer at 13). While a court should give "significant weight" to the "unique burdens" placed on a

---

**26.** For example, KPMG states that the inability to implead other responsible parties from the United Kingdom and the inability to obtain live witness testimony from key witnesses adds to its burden to defend itself.

defendant that must defend in a foreign court, *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987), the court recognizes that "modern advances in communications and transportation have significantly reduced the burden of litigating in another country." *Sinatra*, 854 F.2d at 1199.[27]

"Unless such inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction." *Roth*, 942 F.2d at 623 (quoting *Hirsch*, 800 F.2d at 1481). The court finds that the burden is not such as to deprive KPMG of due process and thus, is not unreasonable.

### c. Conflict with a Foreign Sovereignty

"A foreign nation presents a higher sovereignty barrier than another state within the United States." *FDIC*, 828 F.2d at 1444. Thus, the risk of conflict with a foreign sovereignty may undermine the reasonableness of personal jurisdiction. *Pacific Atlantic*, 758 F.2d at 1330. However, the Ninth Circuit has previously held that this factor is not dispositive because, if given controlling weight, it would always prevent suit against a foreign national in a United States court. *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1333 (9th Cir.1984), *cert. denied*, 471 U.S. 1066, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985). Nonetheless, the court finds that this factor weighs in KPMG's favor because KPMG is an English partnership, staffed by English citizens, and is subject to the auditing and accounting laws of the United Kingdom.

### d. Interest of Forum State

California's interest in the resolution of this contract dispute involving a resident, although enough to provide minimum contacts for establishing jurisdiction, nevertheless is not sufficiently powerful to trump the interests of an English court in adjudicating the fallout from the collapse of a major player in the London insurance market. CalFed has not provided any argument to persuade the court to the contrary. This factor weighs in KPMG's favor.

### e. Most Efficient Resolution

The court presumes[28] that CalFed would argue that California would most efficiently resolve the second third-party action for the simple reason that California offers CalFed the opportunity to preserve its claim over KPMG against the following: potential rejection of the settlement agreement which might trigger the start of two major litigation actions; statute of limitations bars; and jurisdictional bar over KPMG if the action continues in New York. CalFed does posit that adjudication under the laws and more expansive discovery rules of California, rather than those of England, would promote an efficient resolution.

---

**27.** In *Sinatra*, the court also noted that the continuing contacts between California and the defendant's United States-based agent lessened the defendant's burden than if the defendant had no physical presence or agent within the United States. *Sinatra*, 854 F.2d at 1199. While the court does not reach a decision on the existence of an agency relationship between KPMG and PMM, CalFed has alleged that PMM, as the Los Angeles affiliate of the international accounting firm of KPMG Peat Marwick McLintock, acted as an agent for the London affiliate, KPMG, to facilitate the performance of KPMG's responsibilities on behalf of CalFed. *See, e.g.*, Rutland Decl. ¶¶ 10, 16 ("From the time I first met with Allen until the time I left CalFed, Allen always represented to me that PMM and KPMG were acting as one accounting firm for CalFed's benefit, and in my frequent dealings with each of them I had every indication that Allen's representation was accurate."); CalFed's Proposed Jurisdictional Facts, Exh. F., Memo of 11/03/88 from John Taylor [Los Angeles Office] to Tom Allen [of London] at # P00684–87 ("Please send [us] copies of . . . billings issued by you to Anglo . . . Jerry St. Dennis [of CalFed] has requested that we keep him informed as to subsidiary company billings, including Anglo"; "Please provide us with significant comments which should be brought to the attention of CalFed top management and/or Board of Directors as you see fit"; "CalFed management and Board of Directors would like to understand Anglo's maximum policy sizes and net retention. Please provide us with Anglo's [schedule of ceded reinsurance treaties and policies for significant clients]").

**28.** Despite its claim that California can assert limited jurisdiction over KPMG, CalFed has not addressed the reasonableness factors—the third prong of the jurisdictional test—in its submissions.

However, New York choice of law rules will apply upon transfer to California because a transferee court applies the law of the transferor forum. *Ferens v. John Deere Co.,* 494 U.S. 516, 530–31, 110 S.Ct. 1274, 1283–84, 108 L.Ed.2d 443 (1990). New York courts apply a "paramount interest" test to choice of law issues involving contractual disputes. Under such a test, "the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Hutner v. Greene,* 734 F.2d 896, 899 (2d Cir.1984) (citations omitted); *Tokio Marine & Fire Ins. Co. v. McDonnell Douglas,* 465 F.Supp. 790, 799 (S.D.N.Y.1978) (Motley, J.), *aff'd* 617 F.2d 936 (2d Cir.1980). Thus, the California transferee court would apply such a test to determine whether California or English law should apply.

While the court does not reach a decision on whether the transferee court will apply California or English law, it is possible that a California court will find that English law applies. Thus, whether transfer to California truly results in a more efficient resolution is an open question subject to several variables, not the least of which are the prior pending and overlapping actions in England, currently being prepared for trial, which make an English courtroom a likely candidate for efficiency and judicial economy. This factor is a very close call and does not swing persuasively in the direction of either party.

### f. Convenient and Effective Relief for Plaintiff

Both parties argue that their respective forum is more convenient than the other in terms of witnesses, documents and travel costs. Of course California would be the most convenient for the plaintiff because it is CalFed's home forum. But CalFed has shown that it can fly to England for business-related as well as litigation-related purposes. There is no indication in the submissions to the court that effective relief would be unavailable in England. If a significant difference exists in the interpretation of breach of contract, negligence, or indemnification between English and California law, plaintiff has not made this showing. CalFed gets slight favor on this factor only because California is more convenient for CalFed; the effective relief is not more sure in one forum over another.

### g. Availability of an Alternative Forum

As previously mentioned, England and New York are the alternative fora. The Ninth Circuit has held that the plaintiff "bears the burden of proving the unavailability of an alternative forum." *Sinatra,* 854 F.2d at 1201; *FDIC,* 828 F.2d at 1445. While CalFed has identified that proceeding in England may decrease the likelihood of a favorable result—due to supposedly more restrictive discovery rules and the possible negative effects of an English court's interpretation of California law—CalFed has not shown why England or New York are unavailable fora.

On balance, then, the following three factors favor CalFed: extent of purposeful interjection, burdens on the defendant, and convenience and effectiveness of relief for plaintiff. The following three factors favor KPMG: conflict with sovereignty of foreign state, forum state's interest in adjudication, and availability of an alternative forum. One factor favors neither side: most efficient judicial resolution. Because the court's balancing reveals that reasonableness may be a close question in this case, I conclude that KPMG has not presented a compelling case that exercise of jurisdiction is unreasonable so as to overcome the presumption that "once purposeful availment has been established, the forum's exercise of jurisdiction is presumptively reasonable." *Roth,* 942 F.2d at 625.

### B. Venue

The applicable venue statute is 28 U.S.C. § 1391(c) which provides, in relevant part:

For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in

which it is subject to personal jurisdiction at the time the action is commenced.[29]

Having found that CalFed has made a prima facie showing that California can exercise jurisdiction over KPMG, the court must conclude that venue is likewise proper in the Central District of California.

### III. Merits of Motion to Transfer

Once a movant has met the threshold tests of whether a change in circumstance or the interests of justice compel a transfer request from a plaintiff-movant, and whether the action could have been brought in the proposed transferee district, the court has discretion to grant or deny the transfer motion.

 In exercising its discretion, the court must analyze several factors, including: (1) convenience of parties, (2) convenience of witnesses, (3) difficulty and cost of obtaining witnesses, (4) access to sources of proof, (5) where the events at issue occurred, (6) where the case can be tried most expeditiously and inexpensively, (7) the plaintiff's choice of forum, and (8) the interests of justice. *See Nat'l Union Fire Ins. Co. v. Turtur*, 743 F.Supp. 260, 263 (S.D.N.Y.1990) (Stanton, J.); *Leif Hoegh & Co. v. Alpha Motor Ways, Inc.*, 534 F.Supp. 624, 626 (S.D.N.Y.1982) (Sprizzo, J.). A review of these factors leads the court to conclude that transfer to California is not proper.

The court addressed the issues underlying several of these factors when considering the threshold requirements for a plaintiff-movant under § 1404(a) and the reasonableness factors in the third prong of California's limited jurisdiction test. Having resolved in CalFed's favor the threshold requirements for a plaintiff-movant as well as the reasonableness factors, the court will not address the overlapping convenience factors—convenience of the parties, where the case can be tried most expeditiously and inexpensively, where the events at issue occurred, the plaintiff's choice of forum, and the interests of justice. Remaining for the court's consider-

ation, therefore, are the second through fourth factors.

The Second Circuit has held that "when a party seeks to transfer on account of the convenience of witnesses under § 1404(a), he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). CalFed has identified 25 potential non-party witnesses who reside in California to testify "on the scope and requirements of KPMG's undertaking to CalFed." (Reply Decl. of Brian M. Cogan, Exh. A). However, KPMG counters that the witnesses having the most bearing on the issue of breach are those who attended the series of meetings where CalFed sought KPMG's cooperation in CalFed's defense against the main action. (Memo in Opp'n to Mot. to Transfer, at 14). According to KPMG, only one of the five participants in those meetings is present in the United States. *Id.*

As to its own situation, KPMG asserts the extreme inconvenience and cost of traveling 3000 miles further than New York that a transfer would exact on it as the defendant party, on its witnesses, and on its access to its documents and sources of proof. KPMG also asserts that since its work for CalFed centered on Anglo and Anglo's position within the Weavers Stamp companies, the documents relating to the relevant financial statements, English accounting and insurance and financial statement standards, and records regarding the sale of Anglo to an English company are likewise located in England. On the other hand, three of KPMG's five witnesses are identified as likely to testify about issues relating to the quality of KPMG's audit work, rather than the breach of any alleged duty—the issue in the third-party action against KPMG. Therefore, these witnesses are not central to KPMG's defense. Similarly, KPMG has described the focus of its relevant sources of proof as relating to the quality and sufficiency of its work.

---

**29.** Whenever a state longarm statute applies, enabling the plaintiff to secure personal jurisdiction of the corporate defendant regardless of where the defendant has been served with process, a district in that state qualifies ipso facto as proper venue as against that defendant. *Commentary on 1988 and 1990 Revisions of Section 1391*, 28 U.S.C.A. § 1391 at 18.

However, as noted at the outset of the court's consideration of CalFed's motion, the burden is on the moving party to establish that there should be a change of forum.[30] In addition, the movant must specify what the testimony of key witnesses generally will cover. Thus, KPMG's description of witnesses and other proof is not outcome determinative with regards to evaluating the convenience of witnesses.

Furthermore, because the plaintiff as movant under § 1404(a) is not entitled to the usual presumptions,[31] the fact that either the plaintiffs and their witnesses must travel from California or defendants and their witnesses must travel from England, does not work in CalFed's favor. Clearly, California is the more convenient forum for CalFed; but that factor in and of itself does not convince the court.[32] Thus, CalFed's motion to transfer pursuant to § 1404(a) is denied.

### Conclusion

In accordance with the reasoning set forth above, the motion by second third-party plaintiff, CalFed, to transfer the second third-party action to the U.S. District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a) is denied.

**IT IS SO ORDERED**

---

**30.** *Factors Etc., Inc.,* 579 F.2d at 218; *In re Connecticut Nat'l Bank,* 687 F.Supp. 111, 113 (S.D.N.Y.1988) (Carter, J.) ("clear and convincing showing" required).

**31.** *See e.g., In re Connecticut Nat'l Bank,* 687 F.Supp. at 113 ("where the balance is in equipoise, plaintiff's choice will not be disturbed").

**32.** *See also* the court's discussion, *supra,* of the following reasonableness factors: burden of defense, interest of forum state, most efficient resolution, and convenient and effective relief for plaintiff.